STATE of Alaska for the Use and Benefit of PALMER SUPPLY COMPANY, Appellants,

v.

WALSH & COMPANY, INC. and General Insurance Company of America and Hohn Corporation, Appellees.

No. 2816.

Supreme Court of Alaska.

March 10, 1978.

As Amended on Rehearing March 16, 1978.

Jerry E. Melcher, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellants.

Robert J. Adolph, Seattle, Wash., and Karl L. Walter, Anchorage, Short, Cressman & Cable, Seattle, Wash., and Groh, Benkert & Walter, Anchorage, for appellee Hohn Corp.

Donald A. Burr, Burr, Pease & Kurtz, Inc., Anchorage, for appellee Walsh & Co., Inc.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, and BURKE, JJ. DIMOND, J. Pro Tem.

CONNOR, Justice.

This appeal arises from a claim filed pursuant to Alaska's "Little Miller Act."[1] *See* AS 36.25.010 *et seq.*

On August 14, 1970, Walsh & Company, Inc. (Walsh), contracted with the State of Alaska, Department of Public Works, to construct the Bethel Regional High School. General Insurance Company of America was the surety on this contract. Walsh entered into a subcontract with Hohn Corporation (Hohn) to perform a portion of the state job. Palmer Supply Corporation (Palmer) supplied materials to Hohn which were used in the Bethel project. Hohn was not bonded and at the time of the judgment below was operating under Chapter XI of the Bankruptcy Act.

Alleging that it had not been paid for a substantial portion of the materials it had furnished to Hohn for the Bethel job, Palmer brought suit pursuant to AS 36.25.020 on the payment bond furnished to Walsh by General Insurance Company. Walsh impleaded Hohn and defended on the ground that Palmer had been paid by a check in the amount of $54,002.12, drawn by Hohn on July 19, 1971, from funds received from Walsh, for the supplies which Palmer had furnished.

After a non-jury trial, the court entered judgment against Palmer ruling that Palmer was not entitled to any payment on its claim. Hohn then filed a motion for attorney's fees which were awarded in the amount of $8,000.00. This appeal follows.

The parties do not agree on the statement of issues. We believe they can fairly be stated as follows:

1. Whether the court erred in finding that Palmer knew that Walsh was the source of the $54,002.12 payment;

2. Whether the court erred in finding that the purported Hohn-Palmer agreement did not permit the application of the $54,002.12 to Hohn's oldest outstanding accounts;

3. Whether Hohn was bound by principles of ratification, waiver or estoppel to Palmer's application of the funds to Hohn's other accounts;

4. Whether the court erred in concluding that Palmer was not entitled to any lien at all against Walsh;

5. Whether the court erred in ruling that Hohn was the prevailing party and, therefore, entitled to attorney's fees;

6. Whether the court erred in failing to grant Palmer's motion for a new trial.

The following is a discussion of the basic facts.

In 1969, Hohn owed Palmer approximately $480,000.00 for material it had purchased and used in various building projects. Many of Hohn's accounts had been out-

---

1. Sec. 36.25.020 provides:

"(a) A person who furnishes labor or material in the prosecution of the work provided for in the contract for which a payment bond is furnished under § 10 of this chapter and who is not paid in full before the expiration of 90 days after the last day on which the labor is performed or material is furnished for which the claim is made, may sue on the payment bond for the amount unpaid at the time of the suit.

(b) However, a person having direct contractual relationships with a subcontractor but no contractual relationship express or implied with the contractor furnishing the payment bond has a right of action on the payment bond upon giving written notice to the contractor within 90 days from the last date on which the person performed labor or furnished material for which the claim is made. The notice must state with substantial accuracy the amount claimed and the name of the person to whom the material was furnished or for whom the labor was performed. The notice shall be served by mailing it by registered mail, postage prepaid, in an envelope addressed to the contractor at any place where he maintains an office or conducts his business, or his residence, or in any manner in which a peace officer is authorized to serve summons.

(c) A suit brought under this section shall be brought in the name of the state or the political subdivision of the state for the use of the person suing in the superior court. No suit may be started after the expiration of one year after the date of final settlement of the contract. The state or political subdivision of the state is not liable for costs or expenses of the suit."

standing for more than 90 days. This situation concerned Palmer, which could only obtain financing for receivables less than 60 days old. Top executives from both companies met on several occasions in 1969 to discuss how Hohn could reduce its outstanding balance. An understanding was reached that Hohn would make several large payments to Palmer. The details of this understanding or agreement were in dispute at the trial. According to Palmer, the companies agreed that funds would be applied only to the oldest accounts unless the amount received was less than $1,000 or a joint check was issued. Hohn denied that there was any such agreement and maintained there was nothing more than a general understanding that payments would be applied to the oldest accounts first.

On July 19, 1971, Hohn issued check number 363 for $54,002.12 to Palmer. At that time, Walsh was concerned that its suppliers were not being paid and instructed Hohn to make sure that the $54,002.12 check was applied specifically to pay for materials used on the Bethel job. Accordingly, the skirt of Hohn's check for $54,002.12 carried the following notation:

"Pay on Account
Bethel High School Project 21011–01
$54,002.12."

Palmer disregarded the notation, applying most of the funds to Hohn's other accounts and only $6,574.17 to bills arising out of the Bethel project. Palmer contended that the notation on Hohn's check was meaningless, and that in light of Palmer's agreement with Hohn, it should have applied the check only to Hohn's oldest accounts. Hohn contended that the notation was an explicit instruction to Palmer to apply the funds to the Bethel account and that Palmer ignored these instructions.[2]

2. The trial court was of the opinion that the notations were instructions, and this conclusion is not contested on appeal.

3. Collins, Palmer's credit manager, testified that it was coincidental that the instructions were followed because these accounts were the

Hohn also introduced evidence to show that despite the purported agreement, in five of seven cases in which checks were issued with similar notations, Palmer did in fact apply the funds according to the notations.[3]

I

Appellant claims that the trial court erred in not finding that the Palmer-Hohn agreement permitted Palmer's application of the $54,002.12 payment to Hohn's other accounts. Palmer argues that the purported agreement stripped Hohn of the right to direct to which accounts payments were to be applied and that, even if Palmer had known Walsh to be the source of the funds, this knowledge did not create a duty to apply the payment for the benefit of the source.

The trial court found that Palmer and Hohn had had an agreement under which Palmer could apply payments in an attempt to prevent Hohn's accounts from becoming more than 90 days old. Palmer does not quarrel with the trial court's characterization of the terms of the agreement, but disagrees with the trial court's conclusion of law that the agreement was not controlling under the facts of this case.

Palmer relies primarily upon *Ott v. Bray*, 114 Fla. 547, 154 So. 209 (1934), in support of its position that although Hohn may have originally had the right to designate the account to which payment should be applied, that right was relinquished by virtue of the Hohn-Palmer agreement. *Ott* concerned an agreement between a mortgagor and a mortgagee to extend a mortgage. As additional collateral for the mortgage extension, a judgment was assigned to the mortgagee. Any sums collected from that judgment were to be applied to reduce the

oldest at the time. However, evidence was introduced to show that payments were made on at least two accounts which were not the oldest. In one case, the Turnkey account, payment was made on it just as it was dropping into the 90-day category.

mortgage, but the mortgagee failed to do so. The court held that the usual rule that a contract fixing the mode of application controls funds received did not apply because the pledge of the judgment was not such a contract. *Id.*, 154 So. at 210.

To the extent that *Ott* may stand for the general rule that a contract fixing the mode of application of funds governs, it does not control here. The case at bar arises in connection with a "Little Miller Act" claim and is, therefore, governed by special principles.

 AS 36.25.010, *et seq.*, is modeled after the federal Miller Act. Like its federal counterpart, Alaska's statute is designed "to protect persons who furnish labor or material for a state public works project from the risks of nonpayment." *State v. Neal and Sons, Inc.*, 489 P.2d 1016, 1020 (Alaska 1971). *See Graybar Electric Co. v. John A. Volpe Construction Co.*, 387 F.2d 55, 58 (5th Cir. 1967); *St. Paul-Mercury Indemnity Co. v. United States for Use of H. C. Jones*, 238 F.2d 917, 921 (10th Cir. 1956). Therefore, in resolving disputes brought under AS 36.25.010, we will give more weight to principles derived from federal case law interpreting the Miller Act than to general common law principles governing debtor-creditor relations. This is the approach taken by the trial court in the case at bar, and of which we approve.

 The trial court applied several established principles in deciding the case at bar. One general principle is that, "[a] debtor has power to determine the application of any money that he tenders to his creditor, and has a right to say to which of several demands the payment shall be applied." *Schreiber v. Armstrong*, 70 N.M. 419, 374 P.2d 297, 299 (1962). Restatement of Contracts, § 387 (1932). *See also Stephenson v. Ketchikan Spruce Mills, Inc.*, 412 P.2d 496 (Alaska 1966). The creditor is under a correlative duty to apply the money as directed by his debtor, even though he does not consent to the debtor's wishes. More par-

ticularly, cases interpreting the Miller Act hold that when a creditor knows, or has reason to know, that the money paid to him is received from a particular bonded project, it is the creditor's duty to apply the payment received against the account for that project. *United States for Use of C. H. Benton, Inc. v. Roelof Construction Co.*, 418 F.2d 1328 (9th Cir. 1969); *Graybar Electric Co. v. John A. Volpe Construction Co.*, 387 F.2d 55 (5th Cir. 1967); *see also* Restatement of Contracts, § 388 (1932).

As the court noted in *St. Paul Fire and Marine Insurance Co. v. United States for Use of Dakota Electric Supply Co.*, 309 F.2d 22, 25 (8th Cir. 1962):

> "If the debtor is under a duty to a third person to devote funds paid by him to the discharge of a particular debt, the payment must be so applied if the creditor knows or has reason to know that duty. This is so despite the debtor's contrary direction."

Similarly, in *Graybar Electric Co. v. John A. Volpe Construction, Co., supra*, at 59, the court stated:

> "The rule is clear that, when a creditor comes into possession of funds under circumstances that he knows or is chargeable with knowledge that all or a portion of the source of such funds is from a general contractor on a public project, the creditor is bound to apply such funds to the job account of the principal or general contractor notwithstanding any directions he may receive from his payor." (footnote omitted)

 Palmer argues that these and other Miller Act cases are distinguishable because they involve misconduct or fraud. However, the applicable principles do not depend upon misconduct or fraud, and several courts have so held. *See Consolidated Electric Co. v. United States for Use of Gough Industries*, 355 F.2d 437, 440 (9th Cir. 1966); *United States for Use of Clark-Fontana Paint Co., Inc., v. WIBCO, Inc.*, 396 F.Supp. 1253 (D.D.C.1975). We are persuaded that this is the right result and that

the trial court ruled correctly as to this question in the case at bar.

◼ Appellant next asserts that Walsh should be bound by Palmer's application of the $54,002.12 payment to Hohn's other accounts. Palmer argues that we should require a general contractor who fails to protect itself from its subcontractor's insolvency to bear the loss rather than shifting that loss to an innocent supplier. Palmer contends that Walsh could have protected itself by obtaining a payment bond from Hohn, issuing a joint check, or by paying the materialmen directly. The weakness in this argument is its premise that Palmer was "innocent." As we note below, the trial court found, and there is support for its finding in the evidence, that Palmer knew or at least had reason to know that the money in question came from Walsh. Given this knowledge, Palmer was under a duty to apply the payment to the Bethel account.

## II

Palmer disputes the trial court's finding that Palmer knew that Walsh was the ultimate source of the $54,002.12.

Palmer's personnel denied having known that Walsh was the prime contractor on the Bethel job. Read, Palmer's vice president and treasurer, testified that it had not occurred to him that the notation on the $54.002.12 check had been made in order to protect Walsh, the source of those funds. Larry Collins, Palmer's credit manager, testified that he had received no communication from Hohn that Walsh was disbursing funds, though he admitted that he was in close contact with Hohn. However, Collins stated that even if he had known that the money was coming from Walsh and that Walsh and Hohn had agreed that money should be applied to the Bethel account, he would have ignored their agreement.

Steinfeld, who was Hohn's president at the time in question, testified that he found it ridiculous that Collins did not know

Walsh to be the source of the $54,002.12 payment, since Collins was in constant contact with people at Hohn.

Donald Surgenor, the general manager of Hohn, had told Collins to expect a large payment from Hohn in July. Collins denied that Surgenor had told him the source of the payment. Surgenor stated that there was daily contact between Palmer and Hohn and that there was direct communication of the fact that Hohn was being paid by Walsh.

According to Steinfeld, Hohn asked its subcontractors and suppliers to help Hohn get all invoices for the Walsh job together so that Hohn could receive payment from Walsh. Steinfeld testified that Palmer was one of the suppliers which helped Hohn in this regard. Steinfeld stated that Palmer had a sales representative, Bill Stromberg, working in Anchorage and that Stromberg was a liaison between Hohn and Palmer for the purpose of getting all of the Palmer invoices together for the Walsh job. Steinfeld did not say that Stromberg actually worked on the pay estimate, but he did state that Collins was aware that these estimates were being prepared. Collins denied being aware of this.

◼ In summary, despite the Palmer denial knowledge, the fact remains that Palmer and Hohn had an extensive relationship. They were in close contact concerning the payment schedules. Hohn's payment was important to Palmer because of its financing situation. Thus, there is sufficient evidence to support the trial court's finding that Palmer knew that Hohn was being paid by Walsh for the Bethel project, and we cannot conclude that the finding was clearly erroneous.

## III

Palmer also argues that Hohn is bound on theories of ratification, waiver, or estoppel by Palmer's application of the funds to Hohn's other accounts. Palmer argues that Hohn knew how the funds were applied but

made no objection until after bankruptcy proceedings were filed. Palmer argues that it changed position in reliance on Hohn's agreement that payments would be applied to the oldest accounts first, and that Hohn should now be estopped to disagree with that agreed-upon application. Moreover, Palmer urges that Hohn, by its silence, acquiesced in Palmer's actions and, even assuming Palmer violated Hohn's rights, Hohn both waived its rights and ratified Palmer's actions.

■ The doctrines of ratification, waiver and estoppel all require that the party to be bound must have knowledge of the material facts. Palmer's monthly statements, sent to Hohn, indicated that the $54,002.12 payment had not been applied in accordance with Hohn's instructions. Hohn's monthly status reports, which were made available to Palmer, reflected that Hohn believed that the payment had been credited, in its entirety, to the Bethel school account. Apparently, each party ignored the other's statements. There was testimony from Surgenor that there had been disputes over discrepancies in accounts between the two companies, and that these disputes were generally not resolved. In addition, Hohn had informed Palmer that it was changing to a job-by-job payment basis,[4] and Hohn may have believed that Palmer was crediting its accounts accordingly.

■ Palmer also asserts that by a letter of September 16, 1971, it informed Hohn of how the $54,002.12 payment had been applied. However, this letter merely shows the aging of accounts by 30–60–90 days, and not how specific payments were applied to each account.

Under these circumstances, we conclude that the September 16 letter does not pro-

vide a sufficient factual foundation for the application of the doctrines of waiver, estoppel, or ratification.

## IV

■ Palmer argues that even if the $54,002.12 were applied to Hohn's Bethel account, Palmer is still entitled to a lien in the amount of not less than $24,120.44. This amount represents Palmer's computation of Hohn's Bethel account balance assuming $54,002.12 had been credited to that account. The trial court concluded that Palmer's assertions of what it would have done had the $54,002.12 been credited to the Bethel school account were merely speculative. Our review of the entire series of transactions from July of 1971 until Hohn filed its petition in bankruptcy reveals that the trial court's conclusion was not clearly erroneous. We therefore find no merit in appellant's arguments.

## V

Palmer contends that Hohn should not have been awarded an attorney's fee because it was not the prevailing party. First, Palmer claims that it is entitled to a lien of at least $24,120.44, but we have already disposed of this contention. Second, Palmer points out that it did not sue Hohn. It was Walsh who brought Hohn in as a third party defendant in the litigation arising from Palmer's Little Miller Act claim.

■ As the trial court noted, the realities of this kind of litigation are that the prime contractor and his surety will im-

---

4. Hohn introduced evidence that in October of 1970, it had switched over to a job-by-job paying basis and so informed Palmer, which meant that new accounts would be paid specifically rather than paying on the oldest accounts. Hohn's theory was that even assuming some original agreement concerning payment, this

notification shows that the agreement changed. Collins testified that Hohn would have been permitted to change over to a job-by-job payment basis only when its account was current, though the Hohn people denied knowledge of this condition.

plead the party which may ultimately have to pay the judgment or which has knowledge of the facts necessary for the defense of the action. The major dispute in this case was whether the debt to Palmer had been satisfied by Hohn's payment. The question was resolved in favor of Hohn, which was forced to defend and establish that Palmer had misapplied the funds paid to it. "The determination of which party is the prevailing party is vested, in the first instance, in the trial judge's discretion and is reviewable on appeal only for abuse." *Continental Ins. Co. v. U. S. Fid. & Guar. Co.*, 552 P.2d 1122, 1125 (Alaska 1976) (footnotes omitted). We find no abuse of discretion in the trial court's determination that Hohn was the prevailing party.

Appellant also argues that the award of an $8,000.00 attorney's fee was manifestly unreasonable. We do not find this to be the case, since appellee's expenditures for defense of this action were greatly in excess of the amount awarded. In view of the amount of effort which went into discovery, pretrial proceedings, the trial, and post-trial proceedings, we are unable to say that the trial court abused its discretion in the award of attorney's fees.

### VI

Finally, Palmer assigns error in the failure of the trial court to grant a new trial. Asserting that there was newly discovered evidence, Palmer offered an affidavit of its sales representative Stromberg, stating that he did not help Hohn prepare its pay estimate. Since Palmer knew of Stromberg's whereabouts, and could have obtained his testimony before trial, the evidence is not of such a nature that it could not have been discovered before trial by due diligence. Civil Rule 59(d). Grounds for granting a new trial were, therefore, not shown. Palmer's other reason for seeking a new trial was the failure of the trial court to understand that a substantial portion of plaintiff's claim should have been allowed, even if all of the $54,002.12 check had been reallocated to the Bethel project. We have already disposed of this point adversely to Palmer in the earlier portions of this opinion.

AFFIRMED.

MATTHEWS, J., not participating.